UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

BARBARA S. GODSEY )
)
V. ) NO. 2:14-CV-192
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This a judicial appeal of the denial by the Commissioner of her applications for disability insurance benefits and supplemental security income under the Social Security Act following a hearing before an Administrative Law Judge ["ALJ"]. The Plaintiff and the Defendant have filed Motions for Summary Judgment [Docs. 12 and 14].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff asserts that she became disabled as of September 3, 2009. Her insured status for disability insurance purposes expired December 31, 2010. Thus, to be entitled to disability insurance benefits she must show that she was disabled on or before that date. Of course, this date restriction does not apply to her application for supplement security income. She was a "younger" individual as defined by the regulations both on her disability onset date and through the date of the ALJ's adverse decision on February 4, 2013. She has a high school education and there is no dispute that she cannot perform her past relevant work.

Plaintiff's medical history is summarized in the Commissioner's brief as follows:

> In October 2009, Plaintiff reported to a case manager at Scott County Behavioral Health (Scott County) that she had quit her job due to a family emergency (Tr. 456). The next month, she said she was looking at a vocational rehabilitation program, but that it was hard to find get to work because she was caring for ill family members (Tr. 450). She said she took her mental health medication as prescribed, but had been having increased anxiety and mood swings (Tr. 450).
> Plaintiff continued to receive frequent treatment from Scott County throughout the relevant period. In December 2009, she said her mood felt "a little better," but she continued to report some problems with anxiety (Tr. 449). She said she planned to look for work after the New Year, and she reported spending her spare time with her children and her new baby granddaughter (Tr. 449). On

examination, she appeared mildly depressed, but she smiled and her affect brightened when she talked about her granddaughter (Tr. 449).

In January 2010, Plaintiff reported irritability and temper problems and said she felt more depressed (Tr. 446). A case manager reported that Plaintiff "[had] been keeping busy taking care of her granddaughter" (Tr. 448). Later that month, Plaintiff complained that the "least little thing" would make her very anxious and nervous (Tr. 445). On examination, she appeared mildly depressed (Tr. 445).

Plaintiff reported to a primary care provider in February 2010 that her depression was better (Tr. 389). Later that month, at Scott County, Plaintiff said she was tolerating the transition to a new medication (Tr. 442). She said she had been keeping her grandbaby, which kept her busy during the day (Tr. 442, 444). She also said she was meeting soon with a vocational rehabilitation specialist, as she felt that getting back to work could help keep her mind off of her symptoms (Tr. 442). On mental status examination, Plaintiff appeared mildly depressed and mildly anxious (Tr. 442).

In March 2010, Plaintiff was "doing well" and filled out a job application to be a waitress at Olive Garden (Tr. 441). She said her depression was improving and she continued to care for her granddaughter and keep busy during the day (Tr. 441). She reported the next month that her mood was somewhat more stable (Tr. 652). She had interviewed for the job at Olive Garden a couple weeks earlier (Tr. 654). She reported to a primary care provider that she had no mental health complaints and was feeling better with new medication (Tr. 553).

Plaintiff reported feeling better in May 2010 and denied significant irritability and any symptoms of hypomania or mania (Tr. 646). Her case manager opined that she was doing well at her usual level of functioning and appeared stable (Tr. 648). That month, Plaintiff told a primary care provider that she had no psychiatric complaints and that her medication helped her depression (Tr. 551).

At Scott County, Plaintiff said she was doing well for the rest of 2010 (Tr. 645, 676, 751, 753, 755-56, 758-59, 762, 769, 1079-80, 1082, 1084). She reported watching her granddaughter quite a bit and appeared to be stable at her baseline level of functioning (Tr. 645, 751, 754, 762, 764, 766, 1080, 1082, 1084).

In February 2011, Plaintiff reported not doing well and was feeling more irritable and more forgetful (Tr. 1076-78). Over the next couple months, she reported doing "okay" and continued to babysit her granddaughter (Tr. 1065-66, 1072, 1074).

In June 2011, Plaintiff reported that she had not been taking her medication and was feeling more depressed (Tr. 1057). A nurse at Scott County worked with Plaintiff to help get low-cost medication (Tr. 1057). The next month, Plaintiff said she was doing better since restarting her medication (Tr. 1053, 1055). She appeared mildly depressed (Tr. 1055).

Plaintiff reported "a lot of bad days" in September 2011 and said her biggest stressor was worrying about her disability case (Tr. 1030, 1034). Plaintiff's medications were adjusted, and she reported doing "ok" the next

3

month, though she worried about a recent lung x-ray (Tr. 1024). Later in October 2011, she continued to express concern about a "spot" on her lungs (Tr. 1017, 1019). In November and December 2011, Plaintiff reported doing a little better but was still nervous about her physical health (Tr. 1005, 1010). She continued to appear anxious in February 2012 (Tr. 989).

    Plaintiff reported doing better on medication in March 2012 and felt "ok" overall (Tr. 1194-96, 1198). She appeared psychiatrically stable in April 2012 and reported feeling "pretty good" in May 2012, though she appeared anxious (Tr. 1173, 1175, 1186, 1188). In July 2012, Plaintiff was not doing well, exhibited significant extrapyramidal symptoms, and would not maintain eye contact during an examination (Tr. 1142, 1145, 1149, 1153). The next month, she reported feeling anxious and depressed (Tr. 1126, 1129).

    On September 5, 2012, Plaintiff was hospitalized due to suicidal and homicidal thoughts after threatening her boyfriend with a loaded shotgun (Tr. 1235-1306). She responded well to medication, and was discharged a week later, on September 12, 2012 (Tr. 1235-36). On discharge, Plaintiff received a global assessment of functioning (GAF) score of 70 (Tr. 1235).

[Doc. 15, pgs. 2-5].

In addition to this evidence, the record also contains an opinion of a State Agency psychologist dated July 7, 2010, who concluded that the Plaintiff had no severe mental impairment. (Tr. 90). Also, on December 20, 2010, a different State Agency psychologist opined that the Plaintiff had mild restrictions in her activities of daily living, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 107).

This was the medical history before the ALJ. However, Plaintiff submitted evidence after the ALJ's adverse decision to the Appeals Council. This evidence consisted of both treatment records and an opinion by her treating psychiatrist, and is summarized in the Commissioner's brief as follows:

    A week after her hospitalization, Plaintiff appeared to be functioning much better and was much more stable (Tr. 1370). The next month, in October 2012, Plaintiff still felt irritable, but her extrapyramidal symptoms were almost

4

totally gone (Tr. 1363). Psychiatrist Rhonda Bass, M.D., noted that polypharmacy had contributed to Plaintiff's hospitalization (Tr. 1360). Dr. Bass noted that Plaintiff received a GAF score of 70 upon discharge from the hospital, but the psychiatrist opined that she "would put [it] at 60/65 today" (Tr. 1361). Dr. Bass noted that Plaintiff was dealing with several stressors, and she also expressed concern that Plaintiff showed a positive screen for amphetamines during her hospitalization (Tr. 1361). Later that month, Plaintiff appeared stable and reported that she was doing well and appeared stable (Tr. 1356). Plaintiff reported "doing well" the next month (Tr. 1400).

In December 2012, Plaintiff appeared stable and appeared to be making progress with her medication management (Tr. 1345). She told Dr. Bass she was not doing well on her current medications, and Dr. Bass agreed to co-sign a letter in support of her application for disability (Tr. 1342).

Plaintiff reported overwhelming anxiety the next month, made worse by the recent death of her aunt (Tr. 1333-34). Dr. Bass opined that Plaintiff had been very difficult to stabilize and was not there yet (Tr. 1333). Dr. Bass noted that she had "signed [Plaintiff's] disability paperwork" (Tr. 1333).

On February 14, 2013, Dr. Bass wrote a letter to Plaintiff's attorney in support of Plaintiff's disability application (Tr. 1308-10). Dr. Bass stated that she had seen Plaintiff on a regular basis since 2010 (Tr. 1310). She noted that her office does not evaluate individuals for their capacity to work, but opined that Plaintiff continued to be symptomatic (Tr. 1308-09). Dr. Bass stated that Plaintiff continued to report depression and severe anxiety since her discharge from the hospital, though she was no longer acutely dangerous to herself or others (Tr. 1309). Finally, Dr. Bass opined that Plaintiff was "not capable of entering the workforce at this time or in the imminent future due to well documented chronic mental illness" (Tr. 1310).

On March 7, 2013, Dr. Bass and Juanita Witt, a nurse in Dr. Bass's office, signed a mental RFC questionnaire, in which they indicated that Plaintiff was largely unable to meet competitive standards in the mental abilities required for unskilled work (Tr. 1312-16). The providers noted that their office does not perform testing regarding the mental abilities and aptitudes needed to do unskilled work (Tr. 1314). Dr. Bass and Ms. Witt also indicated that Plaintiff would need to be absent from work for more than four days per month due to her impairments or treatment (Tr. 1316).

[Doc. 15, pgs. 5-6].

The mental RFC ["residual functional capacity"] form filled out by Dr. Bass and Nurse Witt on March 7, 2013, also contained opinions with respect to how restricted they viewed the Plaintiff to be in various work-related areas of functioning. These were

5

prefaced by a hand written statement that "[w]e do not do testing in these areas. These are speculative based on clinical assessment." (Tr. 1314). In the area of "mental abilities and aptitudes needed to do unskilled work," they opined that Plaintiff had "no useful ability to function" in her ability to "work in coordination with or proximity to others without being unduly distracted," and to "complete a normal workday and workweek without interruptions from psychologically based symptoms." They opined that she was "unable to meet competitive standards" in her ability to remember work-like procedures; carry out very short and simple instructions; maintain attention for a two hour segment of time; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to routine changes in work settings; or to deal with normal work stress. She was found to be "seriously limited but not precluded" with respect to her ability to understand and remember very short and simple instructions, and to be aware of normal hazards and take appropriate precautions. (Tr. 1314).

The form which Dr. Bass and Nurse Witt filed out asked them to "explain limitations…and include the medical/clinical findings that support this assessment." Other than the handwritten note regarding the assessments being based on "clinical

6

observation," this was not done on the form, although the letter submitted by Dr. Bass on February 14, 2013 went into some detail regarding her findings regarding Plaintiff based upon "our interactions with her in the clinical setting." (Tr. 1308-1310).

In another portion of the mental evaluation of March 7, 2013, Dr. Bass and Nurse Witt opined that the Plaintiff had "no useful ability to function" with respect to her ability to "travel in unfamiliar places." They opined she would be "unable to meet competitive standards" in the ability to interact appropriately with the general public, maintain socially appropriate behavior or to use public transportation. They stated that Plaintiff had a "seriously limited but not precluded" ability to adhere to basic standards of neatness and cleanliness. (Tr. 1315). They opined she would miss more than four days per month from work, and that Plaintiff's "impairments were reasonably consistent with the symptoms and functional limitations described in" the evaluation. They opined that she was not malingering. (Tr. 1316).

At the Plaintiff's hearing before the ALJ on December 18, 2012, after listening to the Plaintiff's testimony, the ALJ took the testimony of Dr. Robert Spangler, a vocational expert ["VE"]. The ALJ asked Dr. Spangler to assume a person of Plaintiff's age, work history and education who "is restricted to the demands of light work, which is work that requires lifting of 20 pounds occasionally and 10 pounds frequently. In addition, I would ask you to assume the claimant could do no jobs that would expose her to excessive dust, fumes, chemicals, and temperature extremes. And she could perform simple, routine job tasks only." When asked if there were jobs which the Plaintiff could perform, Dr.

7

Spangler opined that there were jobs available constituting 80% of 1,985,000 jobs in the nation and 80% of 42,030 jobs in the State of Tennessee. (Tr. 59-60).

In his hearing decision, the ALJ found that the Plaintiff had severe impairments of a back and leg disorder; chronic obstructive pulmonary disease; bipolar disorder; panic disorder without agoraphobia; and posttraumatic stress disorder. (Tr. 24). With respect to the Plaintiff's mental condition, he noted that Plaintiff "has been maintained on medications for her complaints of depression and anxiety, which have been switched and adjusted on occasion. However, treatment records show she was generally doing well except for intermittent bouts of depression and anxiety which were related to situational stressors." (Tr. 24-25).

The ALJ then discussed the medical records which he had at the time of his decision. He noted her extensive treatment history with the Scott County Health Department and Scott County Behavioral Health for both her physical and mental ailments. He noted that a State Agency doctor had opined that she did not have a severe physical impairment. (Tr. 25).[1] As stated later, the ALJ did ascribe physical impairments to the Plaintiff, rejecting this opinion.

Regarding her treatment with Scott County Behavioral Health, he stated that "although their records show intermittent bouts of increased depression and anxiety with mood swings, this was mainly caused by situational stressors including a divorce, losing

---

[1] Plaintiff did not claim that the ALJ erred with respect to his physical findings, so they will be only briefly addressed in this report and recommendation.

her job, questionable polypharmacy, and health issues. The claimant's symptoms generally improved with medication adjustments and treatment." (Tr. 25).

He then discussed the Plaintiff's psychiatric hospitalization on September 5, 2012. He noted she had suicidal and homicidal ideation, having found that her boyfriend "had been cheating on her and had threatened his [*sic*] with a loaded shotgun." (Tr. 25). Plaintiff was diagnosed with bipolar disorder with psychotic features and posttraumatic stress disorder. Her medications were adjusted and the physicians reported she responded well. She was appropriate with staff and other patients. She was discharged on September 12th in stable condition. (Tr. 26).

The ALJ noted that prior to her hospitalization, and in fact prior to much of her mental health treatment, a State Agency psychologist had opined on July 7, 2010 that she did not have a severe mental impairment. On December 20, 2010, again prior to her hospitalization and prior to her suicide attempt, another State Agency doctor opined she had a mild restriction in activities of daily living, and moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 26).

The ALJ then made his findings regarding the level of functional restrictions in activities of daily living; social functioning; and concentration, persistence or pace. He found that the Plaintiff had a mild restriction in activities of daily living. This was based upon the Plaintiff's description of those activities, including caring for her own personal needs, cooking simple meals, washing dishes, cleaning, doing laundry, handling her own finances, shopping, watching television, talking on the phone, having a boyfriend,

9

reading and caring for her young granddaughter. He noted that this conclusion was supported by the opinions of the State Agency personnel outlined above.

However, he found that the Plaintiff also had only mild difficulties in social functioning, whereas the State Agency doctor had found a moderate limitation in this area. (Tr. 98). The ALJ based this finding on her report of getting along with family, friends, neighbors, or others, and the fact she had a boyfriend and engaged in the other activities of daily living outlined above. Also, he noted that the Plaintiff had no evidence that she had ever been fired from a job due to a problem with social functioning. Also, when the Plaintiff was treated for her mental problems and hospitalized in 2012, she was "friendly and cooperative" and "was noted to be appropriate with staff and peers." (Tr. 27). In the area of concentration, persistence and pace, he found she had a moderate limitation, and again noted that the State Agency psychologists agreed with him. Once again, he based this upon the same daily activities, and from problems noted by Scott County Behavioral Health that she "had some problems remembering details on one occasion…." (Tr. 27).

The ALJ then addressed the Plaintiff's residual functional capacity ["RFC"]. He found that she could perform a limited range of light work, with no exposure to excessive dust, fumes, chemicals or temperature extremes, and could perform only simple, routine jobs. In making this finding he considered her credibility. He recounted her testimony of her difficulties. He then stated that she was not entirely credible.

10

With regard to her back, he stated that she had never had any referral to a specialist or any aggressive treatment. Thus, he found she could perform a reduced range of light work.

With respect to her COPD, he found that she could function if not exposed to dust, fumes, chemicals or temperature extremes. As for her reporting she had to elevate her legs, he stated that there was no indication that this was recommended or necessary in any of her treatment records.

He then discussed her mental impairments and the treatment she had received. With respect to the records of Scott County Behavioral Health Services, the ALJ stated that the Plaintiff's problems were "mainly caused by situational stressors," and that her "symptoms generally improved with medication adjustments and treatment." (Tr. 29). He mentioned her September 2012 mental health hospitalization where she was diagnosed with bipolar disorder with psychotic features and posttraumatic stress disorder, once again stating that Plaintiff reported situational stressors. He noted that Plaintiff improved and was discharged in stable condition. He noted that Dr. Bass indicated Plaintiff could not drive, but that Dr. Bass had "advised the claimant against driving if her medication side effects continued or until sensorium cleared up." (Tr. 30). He then noted that Plaintiff testified at her hearing that she had no side effects of her medications. (Tr. 30).

He then evaluated Plaintiff's credibility. In this regard he stated that the Plaintiff "reported that she was fired from her last job because she could not keep up" but had told

11

"Scott County Behavioral Health that she had lost her job due to caring for ill family members." (Tr. 30). He also said her physical functioning implied that she was not credible in that regard, noting her lack of treatment by a specialist for back and leg pain, and respiratory tests failing to show evidence of frequent respiratory distress. He then noted "that no treating physician has placed any permanent restrictions on the claimant nor indicated that she was totally disabled at any time during the period at issue." (Tr.30). He noted her daily activities which indicated that she was not credible in her subjective complaints. (Tr. 30).

He then evaluated and assigned weight to the opinion evidence before him. He found the State Agency psychologist who opined on July 7, 2010 that Plaintiff had no mental limitations was entitled to little weight based on the other evidence in the record and the Plaintiff's subjective complaints. He gave the State Agency psychologist who issued his opinion on December 20, 2010 some weight, but said the doctor's opinion that the Plaintiff had moderate limitations in social functioning was not supported by the record regarding her interactions with family and friends, and her friendly and cooperative interactions at Scott County Behavioral Health, all of which led to the ALJ finding only mild limitations in that area. (Tr. 30-31).

The ALJ then found that while the Plaintiff could not return to her past relevant work, she nonetheless could perform a significant number of other jobs in the national economy, based upon Dr. Spangler's testimony at the hearing. Accordingly, he found

12

that she was not disabled through the date of the hearing decision on February 4, 2013. (Tr. 31-32).

Subsequent to the hearing decision, Plaintiff's attorney obtained the February 14, 2013 letter, the mental residual functional capacity form from Dr. Bass dated March 7, 2013, records from Scott County Behavioral Health dated August 22, 2012 through March 25, 2013, and records from Church Hill Health Department dated June 15, 2012 through April 1, 2013. (Tr. 4). These records were submitted to the Appeals Council, which considered that evidence along with the evidence before the ALJ. On April 30, 2014, it denied review of Plaintiff's case while adopting the ALJ's decision as the final decision of the Commissioner. (Tr. 1).

Plaintiff asserts that the evidence submitted to the Appeals Council supported her allegations of disability due to her severe mental impairments. She says that Dr. Bass's opinions are supported by the record and are reflective of Plaintiff's long term level of functioning. She points out that Plaintiff was treated at Dr. Bass's facility since July 17, 2007, and by Dr. Bass herself since November 20, 2009. As a treating psychiatrist, Plaintiff asserts that Dr. Bass's opinion is entitled to controlling weight in determining the Plaintiff's level of functioning. She asserts that this evidence from Dr. Bass is new and material, and that good cause exists for not presenting the evidence prior to the ALJ's decision. Plaintiff maintains that "at the very least, Plaintiff's claim should be remanded for further consideration of these opinions."

13

Plaintiff acknowledges that for this evidence to be considered, she must satisfy the requirement of 42 U.S.C. § 405(g) and as described in *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993), which held:

> The Court cannot remand for consideration of evidence that is presented after the ALJ's decision but prior to Appeals Council action unless the Plaintiff satisfies the requirements for remand set forth in 42 U.S.C. § 405(g). She must show that the evidence is new, that it is material, and that there is good cause for the failure to incorporate it into the record at the administrative level.

Plaintiff asserts that she has satisfied the requirements that the evidence be new and material, and that good cause existed for not submitting it to the ALJ. She maintains that it would likely have changed the ALJ's opinion, and thus been "material," because the ALJ found very moderate restrictions and noted twice in his hearing decision that no treating source had placed permanent restrictions on the Plaintiff or indicated that she was totally disabled, while Dr. Bass's opinion did both. Plaintiff maintains that there was good cause for not submitting the evidence to the ALJ because the opinions were not generated until after the ALJ rendered his decision, and that this was so because Dr. Bass had never written a letter in support of a patient's disability application ever before. Plaintiff points out that Dr. Bass stated in a December 13, 2012, treatment note that she would write such a letter. (Tr. 1342). This note was made five days before the December 18, 2012, hearing and was not in the record and was "unknown" as of the hearing date. Therefore, says the Plaintiff, the failure to present the evidence to the ALJ was reasonably justified.

14

Thus, there are two issues to be decided. First, was the evidence first presented to the Appeals Council material, and second, did good cause exist for not presenting the evidence to the ALJ.

To establish materiality, a Plaintiff must show that the new evidence would likely change the ALJ's decision. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007). The evidence submitted to the Appeals Council consisted of medical records from the Church Hill Health Department and from Scott County Behavioral Health, an RFC questionnaire completed by Dr. Bass and Nurse Juanita Witt, and a letter from Dr. Bass. The Court finds these to be basically consistent with the treatment notes which were before the ALJ, which indicated improvement and stable symptoms with some occasional adjustments to medication. For example, on September 20, 2012, Plaintiff reported being "much better at this time and much more stable." (Tr. 1370). On October 5, 2012, Dr. Bass noted a GAF assessment of 60-65, which would indicate mild symptoms. On November 27, 2012, the Plaintiff reported that she was "doing well now" following her September hospitalization and medication adjustment. (Tr. 1400). On December 13, 2012, she appeared stable, primarily worried about disability, and although she denied having "had a drink in years" both Dr. Bass and the nurse thought they smelled alcohol on her breath. Her medications were reported as "working well for her." (Tr. 1342-1345). On January 24, 2014, she was stable and responding well to her medications. (Tr. 1333-36).

These treatment records are very similar to those before the ALJ, and the Court does not see any reasonable likelihood that they would cause the ALJ to change his decision.

Dr. Bass's RFC evaluation and letter are another matter, and indicate opinions of symptomology far more serious than those of the ALJ. However, the letter itself (Tr. 1308-1310) summarizes the Plaintiff's treatment and diagnoses, but opines that "she is not capable of entering the workforce at this time or in the future due to well documented chronic mental illness." (Tr. 1308-1310). Whether the Plaintiff is capable of entering the workforce, by itself, is not a proper medical opinion but an issue for the Commissioner to decide.

As for the RFC evaluation 9 (Tr. 1314-1315), it does contain opinions regarding the levels of functioning that Dr. Bass believes Plaintiff can achieve. However, neither the treatment notes which were before the ALJ nor those which were submitted later appear to support the severe restrictions set forth in the evaluation. Under *Keeler v. Commissioner*, 511 F. App'x 472, 473 (6th Cir. 2013) and other cases, an ALJ's decision not to give controlling weight to a physician's opinion because it conflicts with the physician's findings and other evidence in the record will be affirmed. The Court does not believe that the ALJ would give the RFC form controlling weight, but little weight because it is not consistent with the treatment notes that were before the ALJ, those that were provided to the Appeals Council, and other evidence in the record. Also, it is not based on testing but solely on clinical observations and the Plaintiff's complaints.

16

Regarding this, the ALJ based his determination not just on the medical records, but also upon his determination of the Plaintiff's lack of total credibility. In his decision he described valid reasons for his credibility determination, and the Court finds that his decision was supported by substantial evidence in this regard.

In any event, the Court does not believe that there was good cause for the late submission of these items. The Court does not fault Plaintiff's excellent counsel for not being able to have Dr. Bass act with more alacrity in submitting the additional evidence. However, the records submitted to the Appeals Council indicate that there were regular references in Dr. Bass's notes to Plaintiff's desire to obtain disability, and that Dr. Bass told her a week before the hearing was scheduled that she would provide a letter supporting her claim. In spite of this, no request was made for a continuance of the hearing, nor was a request made to keep the record open for this evidence to be obtained and presented to the ALJ. Also, the treatment notes themselves that were provided to the Appeals Council instead of the ALJ almost all date from before the hearing and the ALJ's decision on February 4, 2013. If a continuance had been requested and refused, it would be a different matter. However, under these circumstances it does not appear that good cause exists for the failure to submit these records before the ALJ.

Based upon the foregoing, it is respectfully recommended that the Plaintiff's Motion for Summary Judgment [Doc. 12] be DENIED, and that the Defendant's Motion for Summary Judgment [Doc. 14] be GRANTED.[2]

---

[2]Any objections to this report and recommendation must be filed within fourteen (14)

Respectfully submitted,

s/Clifton L. Corker
United States Magistrate Judge

---

days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).